529 U.S. 266 (2000)
FLORIDA
v.
J. L.
No. 98-1993.
United States Supreme Court.
Argued February 29, 2000.
Decided March 28, 2000.
CERTIORARI TO THE SUPREME COURT OF FLORIDA
*267 Ginsburg, J., delivered the opinion for a unanimous Court. Kennedy, J., filed a concurring opinion, in which Rehnquist, C. J., joined, post, p. 274.
Michael J. Neimand, Assistant Attorney General of Florida, argued the cause for petitioner. With him on the briefs was Robert A. Butterworth, Attorney General.
Irving L. Gornstein argued the cause for the United States as amicus curiae urging reversal. With him on the brief were Solicitor General Waxman, Assistant Attorney General Robinson, and Deputy Solicitor General Dreeben. 
Harvey J. Sepler argued the cause for respondent. With him on the brief were Bennett H. Brummer and Andrew Stanton.[*]
*268 Justice Ginsburg, delivered the opinion of the Court.
The question presented in this case is whether an anonymous tip that a person is carrying a gun is, without more, sufficient to justify a police officer's stop and frisk of that person. We hold that it is not.

I
On October 13, 1995, an anonymous caller reported to the Miami-Dade Police that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun. App. to Pet. for Cert. A-40 to A-41. So far as the record reveals, there is no audio recording of the tip, and nothing is known about the informant. Sometime after the police received the tipthe record does not say how long two officers were instructed to respond. They arrived at the bus stop about six minutes later and saw three black males "just hanging out [there]." Id., at A-42. One of the three, respondent J. L., was wearing a plaid shirt. Id., at A-41. Apart from the tip, the officers had no reason to suspect any of the three of illegal conduct. The officers did not see a firearm, and J. L. made no threatening or otherwise unusual movements. Id., at A-42 to A-44. One of the officers approached J. L., told him to put his hands up on the bus stop, frisked him, and seized a gun from J. L.'s pocket. The second officer frisked the other two individuals, against whom no allegations had been made, and found nothing.
*269 J. L., who was at the time of the frisk "10 days shy of his 16th birth[day]," Tr. of Oral Arg. 6, was charged under state law with carrying a concealed firearm without a license and possessing a firearm while under the age of 18. He moved to suppress the gun as the fruit of an unlawful search, and the trial court granted his motion. The intermediate appellate court reversed, but the Supreme Court of Florida quashed that decision and held the search invalid under the Fourth Amendment. 727 So. 2d 204 (1998).
Anonymous tips, the Florida Supreme Court stated, are generally less reliable than tips from known informants and can form the basis for reasonable suspicion only if accompanied by specific indicia of reliability, for example, the correct forecast of a subject's "`not easily predicted' " movements. Id., at 207 (quoting Alabama v. White, 496 U. S. 325, 332 (1990)). The tip leading to the frisk of J. L., the court observed, provided no such predictions, nor did it contain any other qualifying indicia of reliability. 727 So. 2d, at 207-208. Two justices dissented. The safety of the police and the public, they maintained, justifies a "firearm exception" to the general rule barring investigatory stops and frisks on the basis of bare-boned anonymous tips. Id., at 214-215.
Seeking review in this Court, the State of Florida noted that the decision of the State's Supreme Court conflicts with decisions of other courts declaring similar searches compatible with the Fourth Amendment. See, e. g., United States v. DeBerry, 76 F. 3d 884, 886-887 (CA7 1996); United States v. Clipper, 973 F. 2d 944, 951 (CADC 1992). We granted certiorari, 528 U. S. 963 (1999), and now affirm the judgment of the Florida Supreme Court.

II
Our "stop and frisk" decisions begin with Terry v. Ohio, 392 U. S. 1 (1968). This Court held in Terry: 
"[W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his *270 experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him." Id., at 30.
In the instant case, the officers' suspicion that J. L. was carrying a weapon arose not from any observations of their own but solely from a call made from an unknown location by an unknown caller. Unlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, see Adams v. Williams, 407 U. S. 143, 146-147 (1972), "an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity," Alabama v. White, 496 U. S., at 329. As we have recognized, however, there are situations in which an anonymous tip, suitably corroborated, exhibits "sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop." Id., at 327. The question we here confront is whether the tip pointing to J. L. had those indicia of reliability.
In White, the police received an anonymous tip asserting that a woman was carrying cocaine and predicting that she would leave an apartment building at a specified time, get into a car matching a particular description, and drive to a named motel. Ibid. Standing alone, the tip would not have justified a Terry stop. 496 U. S., at 329. Only after police observation showed that the informant had accurately predicted the woman's movements, we explained, did it become reasonable to think the tipster had inside knowledge about the suspect and therefore to credit his assertion about the cocaine. *271 Id., at 332. Although the Court held that the suspicion in White became reasonable after police surveillance, we regarded the case as borderline. Knowledge about a person's future movements indicates some familiarity with that person's affairs, but having such knowledge does not necessarily imply that the informant knows, in particular, whether that person is carrying hidden contraband. We accordingly classified White as a "close case." Ibid. 
The tip in the instant case lacked the moderate indicia of reliability present in White and essential to the Court's decision in that case. The anonymous call concerning J. L. provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility. That the allegation about the gun turned out to be correct does not suggest that the officers, prior to the frisks, had a reasonable basis for suspecting J. L. of engaging in unlawful conduct: The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search. All the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J. L. If White was a close case on the reliability of anonymous tips, this one surely falls on the other side of the line.
Florida contends that the tip was reliable because its description of the suspect's visible attributes proved accurate: There really was a young black male wearing a plaid shirt at the bus stop. Brief for Petitioner 20-21. The United States as amicus curiae makes a similar argument, proposing that a stop and frisk should be permitted "when (1) an anonymous tip provides a description of a particular person at a particular location illegally carrying a concealed firearm, (2) police promptly verify the pertinent details of the tip except the existence of the firearm, and (3) there are no factors that cast doubt on the reliability of the tip . . . ." Brief *272 for United States 16. These contentions misapprehend the reliability needed for a tip to justify a Terry stop.
An accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity. The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person. Cf. 4 W. LaFave, Search and Seizure § 9.4(h), p. 213 (3d ed. 1996) (distinguishing reliability as to identification, which is often important in other criminal law contexts, from reliability as to the likelihood of criminal activity, which is central in anonymous-tip cases).
A second major argument advanced by Florida and the United States as amicus is, in essence, that the standard Terry analysis should be modified to license a "firearm exception." Under such an exception, a tip alleging an illegal gun would justify a stop and frisk even if the accusation would fail standard pre-search reliability testing. We decline to adopt this position.
Firearms are dangerous, and extraordinary dangers sometimes justify unusual precautions. Our decisions recognize the serious threat that armed criminals pose to public safety; Terry `s rule, which permits protective police searches on the basis of reasonable suspicion rather than demanding that officers meet the higher standard of probable cause, responds to this very concern. See 392 U. S., at 30. But an automatic firearm exception to our established reliability analysis would rove too far. Such an exception would enable any person seeking to harass another to set in motion an intrusive, embarrassing police search of the targeted person simply by placing an anonymous call falsely reporting the target's unlawful carriage of a gun. Nor could one securely confine such an exception to allegations involving firearms. *273 Several Courts of Appeals have held it per se foreseeable for people carrying significant amounts of illegal drugs to be carrying guns as well. See, e. g., United States v. Sakyi, 160 F. 3d 164, 169 (CA4 1998); United States v. Dean, 59 F. 3d 1479, 1490, n. 20 (CA5 1995); United States v. Odom, 13 F. 3d 949, 959 (CA6 1994); United States v. Martinez, 958 F. 2d 217, 219 (CA8 1992). If police officers may properly conduct Terry frisks on the basis of bare-boned tips about guns, it would be reasonable to maintain under the above-cited decisions that the police should similarly have discretion to frisk based on bare-boned tips about narcotics. As we clarified when we made indicia of reliability critical in Adams and White, the Fourth Amendment is not so easily satisfied. Cf. Richards v. Wisconsin, 520 U. S. 385, 393-394 (1997) (rejecting a per se exception to the "knock and announce" rule for narcotics cases partly because "the reasons for creating an exception in one category [of Fourth Amendment cases] can, relatively easily, be applied to others," thus allowing the exception to swallow the rule).[*]
The facts of this case do not require us to speculate about the circumstances under which the danger alleged in an anonymous tip might be so great as to justify a search even without a showing of reliability. We do not say, for example, that a report of a person carrying a bomb need bear the *274 indicia of reliability we demand for a report of a person carrying a firearm before the police can constitutionally conduct a frisk. Nor do we hold that public safety officials in quarters where the reasonable expectation of Fourth Amendment privacy is diminished, such as airports, see Florida v. Rodriguez, 469 U. S. 1 (1984) (per curiam), and schools, see New Jersey v. T. L. O., 469 U. S. 325 (1985), cannot conduct protective searches on the basis of information insufficient to justify searches elsewhere.
Finally, the requirement that an anonymous tip bear standard indicia of reliability in order to justify a stop in no way diminishes a police officer's prerogative, in accord with Terry, to conduct a protective search of a person who has already been legitimately stopped. We speak in today's decision only of cases in which the officer's authority to make the initial stop is at issue. In that context, we hold that an anonymous tip lacking indicia of reliability of the kind contemplated in Adams and White does not justify a stop and frisk whenever and however it alleges the illegal possession of a firearm.
The judgment of the Florida Supreme Court is affirmed.
It is so ordered. 
Justice Kennedy, with whom The Chief Justice joins, concurring.
On the record created at the suppression hearing, the Court's decision is correct. The Court says all that is necessary to resolve this case, and I join the opinion in all respects. It might be noted, however, that there are many indicia of reliability respecting anonymous tips that we have yet to explore in our cases.
When a police officer testifies that a suspect aroused the officer's suspicion, and so justifies a stop and frisk, the courts can weigh the officer's credibility and admit evidence seized pursuant to the frisk even if no one, aside from the officer and defendant themselves, was present or observed the seizure. *275 An anonymous telephone tip without more is different, however; for even if the officer's testimony about receipt of the tip is found credible, there is a second layer of inquiry respecting the reliability of the informant that cannot be pursued. If the telephone call is truly anonymous, the informant has not placed his credibility at risk and can lie with impunity. The reviewing court cannot judge the credibility of the informant and the risk of fabrication becomes unacceptable.
On this record, then, the Court is correct in holding that the telephone tip did not justify the arresting officer's immediate stop and frisk of respondent. There was testimony that an anonymous tip came in by a telephone call and nothing more. The record does not show whether some notation or other documentation of the call was made either by a voice recording or tracing the call to a telephone number. The prosecution recounted just the tip itself and the later verification of the presence of the three young men in the circumstances the Court describes.
It seems appropriate to observe that a tip might be anonymous in some sense yet have certain other features, either supporting reliability or narrowing the likely class of informants, so that the tip does provide the lawful basis for some police action. One such feature, as the Court recognizes, is that the tip predicts future conduct of the alleged criminal. There may be others. For example, if an unnamed caller with a voice which sounds the same each time tells police on two successive nights about criminal activity which in fact occurs each night, a similar call on the third night ought not be treated automatically like the tip in the case now before us. In the instance supposed, there would be a plausible argument that experience cures some of the uncertainty surrounding the anonymity, justifying a proportionate police response. In today's case, however, the State provides us with no data about the reliability of anonymous tips. Nor do we know whether the dispatcher or arresting officer had any *276 objective reason to believe that this tip had some particular indicia of reliability.
If an informant places his anonymity at risk, a court can consider this factor in weighing the reliability of the tip. An instance where a tip might be considered anonymous but nevertheless sufficiently reliable to justify a proportionate police response may be when an unnamed person driving a car the police officer later describes stops for a moment and, face to face, informs the police that criminal activity is occurring. This too seems to be different from the tip in the present case. See United States v. Sierra-Hernandez, 581 F. 2d 760 (CA9 1978).
Instant caller identification is widely available to police, and, if anonymous tips are proving unreliable and distracting to police, squad cars can be sent within seconds to the location of the telephone used by the informant. Voice recording of telephone tips might, in appropriate cases, be used by police to locate the caller. It is unlawful to make false reports to the police, e. g., Fla. Stat. Ann. § 365.171(16) (Supp. 2000); Fla. Stat. § 817.49 (1994), and the ability of the police to trace the identity of anonymous telephone informants may be a factor which lends reliability to what, years earlier, might have been considered unreliable anonymous tips.
These matters, of course, must await discussion in other cases, where the issues are presented by the record.
NOTES
[*] Briefs of amici curiae urging reversal were filed for Americans for Effective Law Enforcement, Inc., et al. by Wayne W. Schmidt, James P. Manak, Richard Weintraub, and Bernard J. Farber; for the Justice Coalition by Scott D. Makar; for the National Association of Police Organizations by Stephen R. McSpadden; and for the State of Illinois et al. by James E. Ryan, Attorney General of Illinois, Joel D. Bertocchi, Solicitor General, William Browers and Michael M. Glick, Assistant Attorneys General, and Dan Schweitzer, joined by the Attorneys General for their respective jurisdictions as follows: Bill Pryor of Alabama, Janet Napolitano of Arizona, Mark Pryor of Arkansas, Bill Lockyer of California, Ken Salazar of Colorado, John M. Bailey of Connecticut, M. Jane Brady of Delaware, Earl I. Anzai of Hawaii, Jeffrey A. Modisett of Indiana, Thomas J. Miller of Iowa, Carla J. Stovall of Kansas, Richard P. Ieyoub of Louisiana, J. Joseph Curran of Maryland, Jennifer M. Granholm of Michigan, Mike Hatch of Minnesota, Jeremiah W. (Jay) Nixon of Missouri, Joseph P. Mazurek of Montana, Frankie Sue Del Papa of Nevada, Philip T. McLaughlin of New Hampshire, Patricia A. Madrid of New Mexico, Michael F. Easley of North Carolina, Betty D. Montgomery of Ohio, W. A. Drew Edmondson of Oklahoma, Hardy Myers of Oregon, D. Michael Fisher of Pennsylvania, Jose A. Fuentes Agostini of Puerto Rico, Sheldon Whitehouse of Rhode Island, Charles M. Condon of South Carolina, Paul G. Summers of Tennessee, John Cornyn of Texas, Jan Graham of Utah, Christine O. Gregoire of Washington, and Gay Woodhouse of Wyoming.

Briefs of amici curiae urging affirmance were filed for the Congress of Racial Equality, Inc., by Stefan B. Tahmassebi; for the National Association of Criminal Defense Lawyers et al. by James J. Tomkovicz and Barbara E. Bergman; for the National Rifle Association of America et al. by Robert Dowlut and David B. Kopel; and for the Rutherford Institute by John W. Whitehead and Steven H. Aden. 
[*] At oral argument, petitioner also advanced the position that J.L.'s youth made the stop and frisk valid, because it is a crime in Florida for persons under the age of 21 to carry concealed firearms. See Fla. Stat. § 790.01 (1997) (carrying a concealed weapon without a license is a misdemeanor), § 790.06(2)(b) (only persons aged 21 or older may be licensed to carry concealed weapons). This contention misses the mark. Even assuming that the arresting officers could be sure that J.L. was under 21, they would have had reasonable suspicion that J. L. was engaged in criminal activity only if they could be confident that he was carrying a gun in the first place. The mere fact that a tip, if true, would describe illegal activity does not mean that the police may make a Terry stop without meeting the reliability requirement, and the fact that J. L. was under 21 in no way made the gun tip more reliable than if he had been an adult.