**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 08-5235**

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

     v.

RAYMOND LAVONNE CURETON,

        Defendant - Appellant.

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte. Robert J. Conrad, Jr., Chief District Judge. (3:07-cr-00037-RJC-1)

Argued: December 3, 2009       Decided: February 26, 2010

Before TRAXLER, Chief Judge, NIEMEYER, Circuit Judge, and John Preston BAILEY, Chief United States District Judge for the Northern District of West Virginia, sitting by designation.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Ross Hall Richardson, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Charlotte, North Carolina, for Appellant. Mark Andrew Jones, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee. **ON BRIEF:** Claire J. Rauscher, Executive Director, Cecilia Oseguera, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Charlotte, North Carolina, for Appellant. Edward R. Ryan, Acting United States Attorney, Charlotte, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Raymond Lavonne Cureton pled guilty to possessing a firearm in violation of 18 U.S.C. § 922(g)(1), preserving the right to appeal the district court's denial of his motion to suppress. We affirm.

I.

The following evidence was developed during the suppression hearing.  On August 10, 2006, around 4:30 p.m., Charlotte police dispatch received a 911 call from Syd Neely of the Charlotte Sanitation Department; Syd identified himself by his first name and provided a phone number.  Syd stated that he was Cureton's supervisor and that Cureton's co-workers reported that Cureton was carrying a .357 handgun while on his garbage route. Moreover, Syd provided Cureton's date of birth, full name, assigned truck number and his approximate location.  Finally, Syd asserted his belief that Cureton was a convicted felon.

Officer Nesbitt received the call from dispatch relaying the information supplied by Syd's phone call.  Officer Nesbitt already knew Cureton, who had been working for local law enforcement as a confidential informant.  Officer Nesbitt knew that Cureton was a convicted felon and that his criminal history included "several gun charges."  J.A. 29.  Using the number supplied by Syd, Officer Nesbitt called and requested Cureton's

current location. Syd subsequently notified Officer Nesbitt that Cureton's truck had returned from its route and was parked at the Sanitation Department.

After Officer Nesbitt arrived at the Sanitation Department and began looking for Cureton's assigned truck, he noticed Cureton in the distance wearing an orange work shirt. A roadblock, however, prevented Officer Nesbitt from approaching Cureton and thus he issued a radio call for any officers near the intersection where he saw Cureton. Officer George Nickerson, who heard the original dispatch regarding a suspect carrying a concealed weapon, responded to the call. Officer Nesbitt described Cureton and Cureton's criminal history to Officer Nickerson and informed him that Cureton was last seen walking in Nickerson's direction.

Officer Nickerson parked his patrol vehicle in a parking lot and waited for Cureton to approach on the sidewalk. As Cureton passed, Officer Nickerson asked him "to step over to the car." J.A. 44. Cureton refused, saying that he had done nothing wrong. When Officer Nickerson again asked him to stop for brief questioning, Cureton began running. Officer Nickerson pursued him on foot, yelling for him to stop. During the pursuit, Officer Nickerson saw Cureton reach into the waistband of his pants and grip an object as if he was "gripping the handle of a pistol" and then try to pull the object out of his

3

pants. J.A. 45. When he saw Cureton do this, Officer Nickerson drew his service weapon and continued to follow Cureton around the corner of a Salvation Army building. Eventually, Officer Nickerson chased Cureton across a parking lot in front of a NAPA auto parts store and toward a fenced-in lot behind the NAPA store. Officer Nickerson found Cureton hiding under a truck parked on the side of the NAPA store and ordered him to come out from under the vehicle. Cureton obeyed, but he did not have the purported handgun.

Officer Nesbitt arrived at the NAPA store as Officer Nickerson was arresting Cureton and asked about the gun. Officer Nickerson then explained he saw Cureton reaching into his waistband while they were running. Officer Nesbitt began walking toward where Officer Nickerson had chased Cureton. As he walked through the parking lot in front of the NAPA store, a NAPA employee directed him to look underneath a truck that was parked there. Officer Nesbitt found a .357 magnum under the truck. Cureton later gave a statement "that he had had the gun all day, and when he ran, he ditched the gun under the truck in front of the NAPA store." J.A. 36.

Cureton moved to suppress the gun as well as all statements made by Cureton after the arrest. Relying mainly on Florida v. J.L., 529 U.S. 266 (2000), Cureton argued that the officers lacked reasonable suspicion to make an investigatory stop under

4

*Terry v. Ohio*, 392 U.S. 1 (1968).  Cureton likened the 911 call to an anonymous tip that was not supported by any indicia of reliability.  And, Cureton argued that since it was a bad stop, the subsequent statement admitting possession of the gun should be excluded as "fruit of the poisonous tree."  *Wong Sun v. United States*, 371 U.S. 471, 488 (1963) (internal quotation marks omitted).

The district court denied the motion to suppress, concluding that the tip was reliable and provided sufficient justification for a *Terry* stop:

> I don't think this is an anonymous tip at all. . . . The caller identifies himself in relation to the defendant, named himself as his supervisor.  Indicated the defendant's name, date of birth, other identifying information; [indicated his belief] that [Cureton] had a felony conviction, and left contact information. . . .
>
> I think it's a very reliable tip.  This case is so different than the JL case because of the degree of detail provided by the known tipster; name, date of birth, employer, type of weapon, truck number, contact information, believed felony status -- very detailed information which was corroborated by Officer Nesbitt who had firsthand knowledge of the defendant.
>
> . . . .
>
> . . . It's very reliable information that was provided, was corroborated in part by Officer Nesbitt, who had firsthand observations of a person meeting the description given by Syd, and who had knowledge both of the defendant himself and his criminal record.
>
> . . . .
>
> And it's further confirmed by the action of the defendant who, although not under arrest and free to

5

go, flees in a manner that <u>adds to the reasonable suspicion of the officers</u>.

Not only did he flee, but as he was fleeing, he reached into his waistband, and as Officer Nickerson described . . . it appeared that the defendant was pulling out a . . . weapon . . . . Officer Nickerson credibly feared for his safety, pulled his gun, . . . [a]nd then [found] the defendant hiding under a truck, all of this information when viewed together <u>justifies</u> a <u>Terry</u> stop of the defendant.

And the testimony is that during the brief time of the <u>Terry</u> stop [Officer Nesbitt] . . . had the weapon pointed out to him . . . and reached under the truck and pulled out a .357 magnum which was clearly sufficient probable cause for an arrest.

It is a future act, but the act occurred . . . within a reasonable time of the initiation of the <u>Terry</u> stop . . . .

And I think [Cureton] was lawfully arrested on probable cause grounds, and, therefore, there really is not a fruit of the poisonous tree issue.

J.A. 65-68 (emphasis added).


## II.

Cureton argues, as he did below, that this case is best described as a <u>Terry</u> stop case where law enforcement is attempting to use an anonymous tip to establish the requisite reasonably articulable suspicion. See <u>Florida v. J.L.</u>, 529 U.S. 266, 270 (2000). The government accepts the premise that this case involved a <u>Terry</u> stop but contends that the district court correctly concluded that there was sufficient and reliable information to support reasonable suspicion.

6

Although we agree with the district court's disposition of Cureton's motion to suppress, we believe that Cureton's challenge founders on the threshold issue of whether a seizure ever occurred to "trigger[] the protections of the Fourth Amendment" in the first place. United States v. Brown, 401 F.3d 588, 593 (4th Cir. 2005). "[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual and no reasonable suspicion is required." Florida v. Bostick, 501 U.S. 429, 434 (1991) (internal quotation marks omitted). The general rule is that a seizure "requires either physical force ... or, where that is absent, submission to the assertion of authority." California v. Hodari D., 499 U.S. 621, 626 (1991). A defendant who flees the police in response to an assertion of authority has not been seized, and thus his Fourth Amendment rights are not implicated. See id. at 626, 629 (concluding that "since Hodari did not comply" with the "show of authority," he was not seized "until he was tackled").

In Hodari D., the suspect fled when he saw the police and threw down a small rock which later proved to be cocaine. See id. at 622-23. The Court held that the suspect was not seized until the police apprehended him, and the abandoned cocaine was not the fruit of the suspect's seizure. See id. at 629. Like

7

the defendant in Hodari D., Cureton was not seized before or during his flight. Seizure for Fourth Amendment purposes did not occur until he submitted to Officer Nickerson's order to come out from underneath the truck. Thus, Cureton had not been seized at the time he abandoned the handgun; he essentially gave up his expectation of privacy by abandoning his property during flight. See id. at 629 (holding that cocaine abandoned while defendant was running away from police was not the fruit of an illegal seizure).

Finally, we also reject Cureton's argument that the district court ought to have suppressed his post-arrest statements as "fruit of the poisonous tree." Wong Sun, 371 U.S. at 488 (internal quotation marks omitted). As explained, Cureton was not seized for Fourth Amendment purposes until he yielded to law enforcement and emerged from underneath the truck. We have no difficulty concluding, in view of the totality of the circumstances, that the officers at that point had probable cause to arrest Cureton. This conclusion, in turn, forecloses the argument that Cureton's post-arrest statements were "'fruits' of the agents' unlawful action." Id. at 484.

Accordingly, the district court correctly denied Cureton's motion to suppress.

AFFIRMED